FILED

2006 Sep-21  PM 02:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **JUDY NEW,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 7:05-CV-961-RDP** |
| | } | |
| **CINGULAR WIRELESS, LLC,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

The court has before it Defendant Cingular Wireless LLC's ("Cingular") Motion to Compel Arbitration and to Stay Litigation Pursuant to the Federal Arbitration Act (Doc. # 24) filed under seal February 27, 2006.  The motion has been fully briefed and was under submission on August 3, 2006.  After consideration of all the parties' submissions, the court finds that Plaintiff was not in an agency relationship with her son, Douglas New, nor was she a third-party beneficiary of Defendant's contract with her son.  Moreover, Plaintiff is not equitably estopped from avoiding the arbitration agreement as her claim is not based on the contract between her son and Cingular and she did not receive the type of "direct benefit" from the contract contemplated by the case law.  Furthermore, the court concludes that Plaintiff's claim does not "arise out of" nor "relate to" Defendant's contract with her son, and, thus, she may not be compelled to arbitrate this claim even if she were a party to the agreement.  Finally, the court finds that Defendant has waived its right to compel arbitration of this matter.  Accordingly, Defendant's Motion to Compel Arbitration and to Stay Litigation Pursuant to the Federal Arbitration Act is due to be denied.

I.      **Relevant Facts**

On February 28, 2004, Plaintiff Judy New ("Ms. New") visited a Planet Cellular store in Calera, Alabama, seeking to subscribe to Cingular wireless service. (Doc. # 23 Ex. 1 at 1). Plaintiff filled out an application form for a cellular service account and store personnel performed a credit check to determine her creditworthiness. (Doc. # 23 Ex. 1 at 1). Based on that review, Plaintiff was asked to pay a deposit as a condition of receiving wireless service from Cingular. (Doc. # 23 Ex. 1 at 1). Plaintiff decided against opening a Cingular account at that time because she could not afford the deposit. (Doc. # 23 Ex. 1 at 1-2). In this action, Plaintiff asserts that at the time Cingular requested the deposit as a condition of service, Cingular failed to provide her with notice of an "adverse action" as defined under the Fair Credit Reporting Act. *See* 15 U.S.C. § 1681m. At the time of Plaintiff's application, Cingular was attempting to provide such notices at the point of sale using notices printed on a tear-off pad. (Doc. # 28 Exs. 1 & 2). However, Plaintiff contends she did not receive one of these notices, was not orally notified at the point of sale, nor did she later receive an "adverse action" notice by mail. (Doc. # 23 Ex. 1 at 2).

Later that same day, Douglas New, Ms. New's son, opened an account with Cingular at Planet Cellular in Calera. (Doc. # 37 Ex. 2 at 42-47). There, he signed a Wireless Service Agreement ("WSA") that contained the standard Terms and Conditions in Cingular cellular service contracts. (Doc. # 37 Ex. 2 at 54; Doc. # 43 Ex. 1). The Terms and Conditions of that WSA contain an arbitration provision, which provides, in relevant part:

> INDEPENDENT ARBITRATION . . . [C]INGULAR and you agree to arbitrate any and all disputes and claims . . . arising out of or relating to this Agreement, or to any prior Agreement for products or service between you and CINGULAR or any of your or CINGULAR's affiliates or predecessors in interest. . . . CINGULAR and you acknowledge that this agreement evidences a transaction in interstate commerce and

that the Federal Arbitration Act shall govern the interpretation and enforcement of
. . . this or a prior agreement.

(Doc. # 43 Ex. 1 at 8) (hereinafter "Arbitration Agreement").

Douglas New admits that he told his mother (*i.e.*, the Plaintiff in this case) that she would be allowed to use a phone connected to a contract in his name if she were unable to obtain one on her own.  (Doc. # 28 Ex. 4 at 1).  He further admits that he opened the account referenced above in his name and allowed Plaintiff to use the cellular phone connected to the account, pursuant to his earlier promise.  (Doc. # 37 Ex. 2 at 53; Doc. # 28 Ex. 4 at 1).  Plaintiff used this phone, paid the bill, and called Cingular's Customer Service Center on several occasions in reference to the phone and cellular service.  (Doc. # 37 Ex. 1 at 159-61, 197-98, 237-38 & Ex. 2 at 93).  The parties do not agree as to whether Plaintiff at any time asked her son to open this account or whether she expected him to do this.

## II.    Discussion

There is no dispute that the Arbitration Agreement contained in the WSA is subject to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*. ("FAA").  "In enacting the FAA, Congress demonstrated a 'liberal federal policy favoring arbitration agreements.'"  *MS Dealer Service Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999) (citation omitted).  As such, "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration."  *Id*. at 947.  "By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."  *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985)(emphasis in original) (interpreting 9 U.S.C. § 4).  "But § 4 of the FAA does not confer

a right to compel arbitration of any dispute at any time; it confers only the right to obtain an order directing that 'arbitration proceed *in the manner provided for in [the parties'] agreement*." *Volt Info. Scis., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ.*, 489 U.S. 468, 474-75 (1989) (emphasis in original) (citing 9 U.S.C. § 4). An arbitration agreement is specifically enforceable under the FAA if the following requirements are established: (1) the existence of a written agreement to arbitrate claims; (2) a nexus to interstate commerce; and (3) coverage of the claims by the arbitration clause. 9 U.S.C. § 2.

Here, Plaintiff makes no claim that the Arbitration Agreement contained in the WSA would be unenforceable against a proper party presenting a claim covered by the agreement. Rather, Plaintiff argues that she is not a proper party to the Arbitration Agreement as she is not a signatory of the WSA between Douglas New and Cingular, and, even if she were bound by the WSA, her claim did not "arise from" or "relate to" the WSA since it arose before her son, Douglas New, signed the agreement with Cingular. (Doc. # 28 at 4-5). In the alternative, Plaintiff contends that Cingular has waived its right to enforce its arbitration agreement. (Doc. # 40 at 13).

Defendant argues that Plaintiff must submit her claim to arbitration according to the arbitration provision in the WSA executed by her son, even though she did not sign the agreement, for three reasons. First, Defendant argues that Plaintiff's son was, in reality, Plaintiff's agent when he signed the WSA. (Doc. # 40 at 2-4). Second, and alternatively, Defendant asserts that Plaintiff is a third-party beneficiary of her son's WSA and is therefore bound by its terms, including the Arbitration Agreement. (Doc. # 37 at 11-13). Finally, Defendant contends that Plaintiff, having received "direct benefits" under the WSA, is equitably estopped from avoiding arbitration. (Doc. # 40 at 4-6). Under each of these theories, Defendant insists Plaintiff is bound by the Arbitration

4

Agreement, and the Arbitration Agreement is broad enough to encompass her claim in this case. Defendant further asserts that it makes no difference when Plaintiff's claim arose, because it "arises from" or "relates to" the WSA.  Finally, Defendant denies waiving its right to compel arbitration.

In light of these arguments, the court must decide (1) whether the WSA and its Arbitration Agreement are applicable to Plaintiff under any of Defendant's three theories, (2) if the WSA does apply, whether or not Plaintiff's claim falls within the scope of the Arbitration Agreement, which, by definition, governs all claims "arising out of or relating to" the WSA or "any prior Agreement for products or service," and (3) whether Defendant did, in fact, waive its right to compel arbitration by substantially participating in litigation.  In answering each of these questions, the court will be guided by state law, as "[f]ederal law establishes the enforceability of arbitration agreements, while state law governs the interpretation and formation of such agreements." *Employers Ins. of Wausau v. Bright Metal Specialties, Inc.*, 251 F.3d 1316, 1322 (11th Cir. 2001);  *see also Perry v. Thomas*, 482 U.S. 483 (1987).  Specifically, "[w]hen deciding whether the parties agreed to arbitrate a certain matter . . . , courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc., v. Kaplan*, 514 U.S. 938, 944 (1995).  Thus, the court will  refer to Alabama contract and agency law in order to answer these specific questions, while keeping in mind the federal policy underlying the FAA.

### A.     As a Non-Signatory, Plaintiff is Not Bound by the Arbitration Agreement.

Plaintiff is correct in stating that, under the FAA, no party can be compelled to arbitrate unless that party has entered into an agreement to do so. *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.,* 489 U.S. 468, 478 (1989); *see also AT & T Tech., Inc. v. Communications Workers*, 475 U.S. 643 (1986); *Am. Express Fin. Advisors, Inc. v. Makarewicz*, 122 F.3d 936, 940

(1997). Nevertheless, courts have recognized a number of theories under which nonsignatories may be bound to the arbitration agreements of others. *See, e.g.*, *Thomson-CSF, S.A. v. Am. Arbitration Association*, 64 F.3d 773 (2d. Cir. 1995). These theories arise out of common law principles of contract and agency law, and include: 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel. *See id.* at 776; *see also MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999). In the present case, Defendant points to these three theories in support of its argument that Plaintiff is bound by the Arbitration Agreement incorporated into the WSA signed by Douglas New: (1) agency (Cingular claims Plaintiff's son was acting as her agent when he signed the WSA); (2) common law contract (Cingular contends Plaintiff was a third-party beneficiary under the WSA); and (3) estoppel (Cingular asserts Plaintiff is equitably estopped from avoiding the Arbitration Agreement since she received "direct benefits" under the WSA). The court gives full consideration to each of these arguments in turn, but finds each of them inadequate to overcome the "general rule that a nonsignatory to an arbitration agreement cannot be forced to arbitrate her claims." *Hill v. Nat'l Auction Group, Inc.*, 873 So.2d 244, 247 (Ala. Civ. App. 2003) (quoting *Cook's Pest Control, Inc. v. Boykin*, 807 So.2d 524, 526 (Ala. 2001); *see also Thomson-CSF, S.A. v. American Arbitration Association*, 64 F.3d 773 (2d Cir. 1995); *Ex parte Stripling,* 694 So.2d 1281 (Ala. 1997).

  1. Plaintiff's Son Was Not Acting as Plaintiff's Agent When He Signed the WSA.

Defendant first argues that Plaintiff is bound by the Arbitration Agreement in the WSA because Douglas New, Plaintiff's son, was acting as Plaintiff's agent when he signed the WSA opening the Cingular account. It is true that "[t]raditional principles of agency law may bind a nonsignatory to an arbitration agreement." *Thompson-CSF v. Am. Arb. Association*, 64 F.3d 773,

777 (2d Cir. 1995). However, the agency relationship must first be established under state law. Under Alabama law, the principal test of agency is one of control. *See Brown v. Commercial Dispatch Publ'g Co., Inc.*, 504 So.2d 245, 246 (Ala. 1987) (quoting *Cordes v. Wooten*, 476 So.2d 89, 91 (Ala. 1985) ( "It is elementary that the test of agency is the right of control, whether exercised or not, and that is a question for the trier of fact if the evidence is in dispute.")). "For one to be an [agent], the other party must retain the right to direct the manner in which the business shall be done, as well as the results to be accomplished, or, in other words, not only what shall be done, but *how* it shall be done." *Solmica of the Gulf Coast, Inc. v. Braggs*, 232 So.2d 638, 640 (Ala. 1970). Additionally, "agency is determined by the evidence as a whole." *Brown*, 504 So.2d at 247; *see also Tyson Foods, Inc. v. Stevens*, 783 So.2d 804, 808–809 (Ala. 2000); *Nat'l Sec. Fire & Cas. Co. v. Bowen*, 447 So.2d 133, 137 (Ala. 1983).

Although there may be clear evidence that the alleged principal (Plaintiff) retained the right to control the agent (Plaintiff's son) with respect to the results sought to be accomplished (here, the opening of the cellular service account), Alabama case law requires more than this. *Brown*, 504 So.2d at 248. There must be an additional showing that the principal controlled the manner in which that goal is accomplished. *Id.* at 246, 248. A thorough review of the evidence in this case reveals that Plaintiff did not exercise any appreciable amount of control over Douglas New, her alleged agent. At most, Plaintiff may have *expected* her son to open an account for her to use because of his earlier promise. This is all that Defendant has been able to show (Doc. # 23 Ex. 1 at 2; Doc. # 28 Ex. 4 at 2) but that is an insufficient showing to establish an agency relationship as more is required. Even if Plaintiff and her son agreed on what was to be done–obtaining a cellular phone and account with Defendant–there is no evidence to suggest that Plaintiff gave any directions about *how* it was

to be accomplished; in fact, there is no evidence to suggest that Plaintiff had *any* input regarding the transaction.  (Doc. # 37 Ex. 2 at 48-54).  Further, although Defendant makes much of the fact that Plaintiff took various actions in reference to the account (Doc. # 37 at 4-5, 8; Doc. # 41 at 3), that argument does not cut ice.  The cornerstone of an agency relationship between Plaintiff and Douglas New would be a sufficient showing that Plaintiff exercised control over him, not a showing regarding any control that she had over the account as an authorized user.  Moreover, the court again underscores that any control Plaintiff had or exercised over the account did not exist until *after* Douglas New had signed the contract.  In short, Douglas New, in entering into the WSA with Defendant, was not Plaintiff's agent, and, therefore, Plaintiff is not bound by the WSA and the Arbitration Agreement on an agency theory.

## 2.  Plaintiff is Not a Third-Party Beneficiary of the WSA.

Next, Defendant alleges that Plaintiff is a third-party beneficiary of the WSA under Alabama contract principles, and thus is bound by the Arbitration Agreement.  As Cingular correctly notes, under Alabama law, if a nonsignatory is a third-party beneficiary of the contract containing an arbitration provision, she may be bound to arbitrate her claims.  *Crayton v. Conseco Fin. Corp.-Ala.*, 237 F.Supp.2d 1322, 1326 (M.D. Ala. 2002) (citing *Cook's Pest Control, Inc. v. Boykin*, 807 So.2d 524, 526-27 (Ala. 2001).  The general rule under Alabama law is that "[a] party claiming to be a third-party beneficiary of a contract must establish that the contracting parties intended, upon execution of the contract, to bestow a direct, as opposed to an incidental, benefit upon the third party." *Weathers Auto Glass, Inc. v. Alfa Mut. Ins. Co.*, 619 So.2d 1328, 1329 (Ala. 1993).  This issue is determined by looking to the intent of the parties as indicated by the language used in the contract.  *See Ex parte Stamey*, 776 So.2d 85, 92 (Ala. 2000).

8

In *Crayton v. Conseco Fin. Corp.-Ala.*, the court found the plaintiff was not a third-party beneficiary to a contract between a previous owner of her newly-purchased manufactured home and the finance company. Although Plaintiff had made a down payment and monthly payments for eighteen months under a separate contract with the retail seller and thereafter continued to make payments directly to the finance company, the court held that she could not be considered a third-party beneficiary as she received no direct benefit from the contract. This was the case even though she was living in the house. In reaching this conclusion, the court observed that the finance company, which sought to compel arbitration of the plaintiff's claims, did not intend that she benefit from the original financing contract *at the time the contract was signed*. 237 F.Supp.2d at 1326. Similarly, here, the court finds that, at the time Douglas New and Defendant Cingular entered into the WSA, the parties–or at least Defendant–did not intend to confer a benefit on Plaintiff. In fact, Defendant admits as much in making its argument that it did not waive its right to compel arbitration: "It was not until February 2006–when Ms. New filed her affidavit . . . that Cingular realized Ms. New had been receiving and using Cingular wireless service." (Doc. # 41 at 7; Doc. # 41 Ex. 1 at 2-3). Defendant cannot have it both ways. If Defendant was unaware that Plaintiff was receiving cellular service at the time the WSA was signed, she was, at most, an incidental beneficiary of the WSA with Douglas New. Therefore, Plaintiff is not an intended third-party beneficiary of the agreement.

In a case similar to this one, the court in *Oakwood Mobile Homes, Inc. v. Godsey*, 824 So.2d 713 (Ala. 2001), held that the nonsignatory Plaintiff could not be considered a third-party beneficiary of the financing agreement signed by her husband and the finance company. Even though she lived in the home and had negotiated all the terms of the agreement, and notwithstanding that her husband

merely signed the actual contract, she could not be compelled to arbitrate under the agreement as a third-party beneficiary because she was not claiming a benefit of the contract containing the arbitration clause.  824 So.2d at 719 (quoting *Equifirst Corp. v. Ware*, 808 So.2d 1(Ala. 2001)).  The court reached this result despite the fact that the plaintiff jointly owned the parcel of land funding the mortgage underlying the transaction, she was fully aware of the contract and had reviewed the paperwork, and she was pursuing tort claims for slander of title and fraud, which were arguably intertwined with the contract containing the arbitration agreement.  *Id*. at 716.  None of these circumstances made the plaintiff in that case a third-party beneficiary.

It follows that Cingular's allegation in this case that Plaintiff *benefitted* from the WSA because she, allegedly without their knowledge, was using the phone, misunderstands the case law on this point.  Plaintiff's *claim* is severable from the WSA in this case, and thus Plaintiff cannot be said to be "both claim[ing] the benefit of the contract and avoid[ing] the arbitration provision contained within that contract."  *Stamey*, 776 So.2d at 92.  *Accord Ex Parte Dyess*, 709 So.2d 447, 452 (Ala. 1997) (holding that nonsignatory customer was third-party beneficiary of dealership's insurance policy with its uninsured motorist carrier because, when making the policy to cover customers who test drove vehicles and may have accidents with uninsured motorists, the parties to the contract intended to benefit persons in customer's situation *and the customer sought recovery under the policy–the key is that the customer was seeking to "benefit from the contract"*).  Although she no doubt received *tangible benefits*, such as the use of the cellular phone service in this case (which is similar to living in the home in the *Oakwood Mobile Homes* case), she is not seeking to enforce a *benefit of the agreement* nor a *benefit of the contract*, but rather a statutory claim arising before the WSA was executed by Cingular and Douglas New.  Accordingly, that claim is separate

and independent of the contract itself and Plaintiff cannot be forced to arbitrate her claim under the theory that she is a third-party beneficiary of the WSA.

        3.  Plaintiff is Not Equitably Estopped from Avoiding the Arbitration Agreement.

      Finally, Defendant contends that Plaintiff is equitably estopped from avoiding the Arbitration Agreement because she "received 'direct benefits'" under the contract–here the WSA.  (Doc. # 37 at 14 (quoting *Am. Bur. of Shipping v. Tencara Shipyard, S.P.A.*, 170 F.3d 349, 353 (2d. Cir. 1999)).  To the extent that Defendant asserts that "there are certain limited exceptions, such as equitable estoppel, that allow nonsignatories to a contract to compel arbitration," it is correct.  *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757 (11th Cir. 1993).  But that is the beginning of the argument, not the end of it.

      The majority of the existing case law in this Circuit discusses this possibility of estoppel when a signatory is seeking to avoid arbitration with a nonsignatory who is trying to compel it–a situation inapposite to this case where Defendant signatory is attempting to compel arbitration against the nonsignatory Plaintiff.

      As the Eleventh Circuit has explained:

> Existing case law demonstrates that equitable estoppel allows a nonsignatory to compel arbitration in two different circumstances.  First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause "must rely on the terms of the written agreement in asserting [its] claims' against the nonsignatory."  When each of a signatory's claims against a nonsignatory "makes reference to" or "presumes the existence of" the written agreement, the signatory's claims "arise[ ] out of and relate[ ] directly to the [written] agreement," and arbitration is appropriate.  Second, "application of equitable estoppel is warranted . . . when the signatory [plaintiff] [to the contract containing the arbitration clause] raises allegations of . . . substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract."  Otherwise, "the arbitration proceedings [between the two signatories] would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted."

*MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999) (internal citations omitted).

The appellant in *MS Dealer* was the service corporation, a nonsignatory to the contract, who sought

to compel Franklin, the customer, to arbitrate her claims against it.   Because (1) it was a

*nonsignatory* defendant who sought to compel arbitration, (2) the signatory plaintiff *had to rely on*

*the contract when asserting her claims*, and (3) the signatory plaintiff raised allegations of

"substantially interdependent and concerted misconduct" against a signatory defendant and

nonsignatory defendant, the court found the plaintiff was equitably estopped from avoiding

arbitration.   However, none of these factors is present in this case.   Here, unlike the situation in *MS*

*Dealer*, it is a *signatory* defendant seeking to compel arbitration against a *nonsignatory* plaintiff.

Furthermore, Plaintiff in this case does not (and cannot) rely on the contract to assert her claim, since

it arose before the contract at issue existed.   And Plaintiff's claim cannot allege "concerted

misconduct," as there is but one Defendant.

Both the Alabama Supreme Court and the United States District Court for the Middle District

of Alabama have directly addressed the situation here–*i.e.*, where a signatory defendant seeks to

compel arbitration of the nonsignatory plaintiff's claims under both the "intertwined claim" theory

and the theory of equitable estoppel.   In parsing the appellant's equitable estoppel theory, the

Alabama Supreme Court quoted extensively from the Third Circuit's opinion in *E.I. DuPont de*

*Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 201-202 (3d.

Cir. 2001):

> "With reference to the second theory of equitable estoppel, appellants [signatory
> defendants] rely on a series of cases in which signatories were held to arbitrate
> related claims against parent companies who were not signatories to the arbitration
> clause.   In each of these cases, a signatory was bound to arbitrate claims brought by
> a non-signatory [sic] because of the close relationship between the entities involved,

as well as the relationship of the alleged wrongs to the non-signatory's [sic] obligations and duties in the contract and the fact that the claims were intertwined with the underlying contractual obligations . . . . *Appellants recognize that these cases bind a signatory and not a non-signatory [sic] to arbitration, but argue that this is a distinction without a difference. They are wrong.* Indeed, the Second Circuit recently rejected the same 'distinction without a difference' argument: 'As these cases indicate, the circuits have been willing to estop a *signatory* from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed. As the district court pointed out, however, "the situation here is inverse: E & S, as signatory [defendant], seeks to compel Thomson, a nonsignatory [plaintiff]." While E & S suggests that this is a non-distinction, the nature of arbitration makes it important. *Arbitration is strictly a matter of contract; if the parties have not agreed to arbitrate, the courts have no authority to mandate that they do so. In the line of cases discussed above, the courts held that the parties were estopped from avoiding arbitration because they had entered into written arbitration agreements, albeit with the affiliates of those parties asserting the arbitration and not the parties themselves. Thomson, however, cannot be estopped from denying the existence of an arbitration clause to which it is a signatory because no such clause exists.* At no point did Thomson indicate a willingness to arbitrate with E & S. Therefore, the district court properly determined these estoppel cases to be inapposite and insufficient justification for binding Thomson to an agreement that it never signed.' *Thomson-CSF, S.A.* [*v. American Arbitration Ass'n*,] 64 F.3d [773] at 779 [(2d Cir. 1995)] (internal citations omitted)." 269 F.3d at 201-202 (some emphasis original; some emphasis added) (footnotes omitted).

*Ex Parte Tony's Towing, Inc.*, 825 So.2d 96, 98-99 (Ala. 2002) (all emphasis in original); *see also*

*Crayton v. Conseco Fin. Corp.-Ala.*, 237 F.Supp.2d 1322, 1329-30 (M.D. Ala. 2002) (quoting the

same language from *E.I. DuPont*).  Following the rationale of the *Tony's Towing* court, this court

concludes Defendant cannot compel Plaintiff, a nonsignatory, to arbitrate her claim, whether or not

it is intertwined with the Arbitration Agreement in the WSA.  *See SouthTrust Bank v. Ford*, 835

So.2d 990, 994 (Ala. 2002) (following Tony's Towing and stating that "the doctrine of estoppel

[intertwining] is applicable only to estop a signatory from avoiding arbitration").

_____In the interest of being thorough, the court also recognizes that even in the "inverse situation"

referenced by the Alabama Supreme Court–where a signatory defendant seeks to compel arbitration

against a nonsignatory plaintiff–some case law in this Circuit has compelled arbitration in a very specific context.  For example, the Eleventh Circuit has recognized that, "[o]ther Circuit Courts have applied equitable estoppel to compel arbitration where [nonsignatories] to contracts containing an arbitration clause have sought to enforce their alleged contractual rights." *Blinco v. Green Tree Servicing LLC*, 400 F.3d 1308,1312 (11th Cir. 2005) (citing *Washington Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 267-68 (5th Cir. 2004); *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 418 (4th Cir. 2000)).  Following this line of precedent, the *Blinco* court compelled arbitration of the nonsignatory plaintiff-borrower's claims against the signatory loan servicer-defendant (who was a successor to the original signatory).  The plaintiff had signed the mortgage, but only her husband had signed the note containing the arbitration clause.  The court found that plaintiff's claims under the Real Estate Settlement Procedures Act (RESPA) were based on her status as a borrower on the underlying note, which  contained an arbitration provision.  Although the plaintiff-borrower had argued that the RESPA claim was a statutory one severable from the underlying note, the court reasoned, "it is difficult to understand how Green Tree [the defendant in that case] could be a servicer [covered by RESPA] if there were no Note, and more importantly, how Green Tree could face statutory servicer liability if there were no Note to service." *Id*. at 1311.

This line of reasoning is simply inapplicable here.  Plaintiff's FCRA claim is not predicated on the existence of the WSA or any other contract that Defendant may have with anyone, including Douglas New.  Further, Cingular's potential liability under the FCRA does not require that Cingular have some special relationship or role created by contract, such as a "servicer," to Plaintiff or anyone else.  The FCRA only requires that "[i]f *any person* takes any adverse action with respect to any consumer that is based in whole or in part on any information contained in a consumer report" such

14

person must provide notice of the adverse action to the consumer.  15 U.S.C. § 1681m.  Therefore, liability under the FCRA, unlike the special prerequisites of the RESPA, merely requires  that a defendant take an "adverse action" based on consumer credit report information with respect to any consumer, and not provide the required notice to the consumer.   Since *Blinco* is easily distinguishable from the present case and Plaintiff does not need to reference the WSA, nor any other agreement (or even establish her relationship to Defendant under another agreement) to assert or support her FCRA claim, she cannot be compelled to arbitrate that claim under this derivation of equitable estoppel doctrine.

   **B.    Plaintiff's Claim Does Not "Arise Out of" or "Relate To" the WSA.**

   Even if Plaintiff were bound to the Arbitration Agreement under one of the three theories discussed above (or under any other theory for that matter), it is axiomatic that Defendant still could not compel her to arbitrate her claim if it were not within the scope of the Arbitration Agreement's terms.  "Whether a party has agreed to arbitrate an issue is a matter of contract interpretation: '[A] party cannot be required to submit to arbitration any dispute which [s]he has not agreed so to submit.'"  *Telecom Italia, SPA v. Wholesale Telecom Corp.*, 248 F.3d 1109, 1114 (2001) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)).  Plaintiff argues that the Arbitration Agreement does not apply to her FCRA claim because that claim arose before her son ever signed the WSA.  (Doc. # 28 at 8).   Defendant maintains that the Arbitration Agreement makes no distinction between claims that arise prior to the consummation of the agreement and claims arising thereafter.  (Doc. # 37 at 16).  The relevant language in the Arbitration Agreement reads:

> [A]ny and all disputes and claims (including but not limited to claims based on or arising from an alleged tort) arising out of or relating to this Agreement, or to any prior Agreement for products or service between you and CINGULAR or any of your or CINGULAR's affiliates or predecessors in interest.

(Doc. # 43 Ex. 1 at 8). This language makes the question a close call.

Undoubtedly, the "arising out of or relating to" language of the Arbitration Agreement allows this clause to encompass more than the ubiquitous "arising from" clause. *Kenworth of Dothan, Inc. v. Bruner-Wells Trucking, Inc.*, 745 So.2d 271, 274 (Ala. 1999). However, "it is not as broad as a clause requiring arbitration of 'any dispute between them or claim by either [party to the contract] against the other.'" *Telecom*, 248 F.3d at 1114 (quoting *Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217, 1221 (11th Cir. 2000)). In addition to the breadth of the particular language, any arbitration clause purporting to cover prior transactions must clearly do so by its terms. *Kenworth*, 745 So.2d at 275. This court "will not stretch the language of a contract to apply to matters that were not contemplated by the parties when they entered the contract." *Kenworth*, 745 So.2d at 274 (citing *Koullas v. Ramsey*, 683 So.2d 415, 417 (Ala. 1996)).

The Alabama Supreme Court has often affirmed orders compelling arbitration of disputes "arising from or relating to" transactions entered prior to the arbitration agreement itself. *See e.g.*, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Kirton*, 719 So.2d 201 (Ala. 1998); *First Family Financial Services, Inc. v. Rogers*, 736 So.2d 553 (Ala. 1999). However, those decisions are distinguishable from the facts of this case. Each involved an arbitration clause with language clearly including prior transactions *of all types*. For example, in *Merrill Lynch* the arbitration clause at issue stated unequivocally:

> The undersigned agrees, that *all controversies which may arise between us*, including but not limited to those involving any transaction or the construction, performance,

> or breach of this or any other agreement between us, *whether entered into prior [to],*
> *on, or subsequent to the date hereof*, shall be determined by arbitration.

719 So.2d at 202 (emphasis added).  Thus, the language in that arbitration provision clearly indicated that *any* dispute related to *all* prior transactions were to be arbitrated.

Similarly, in *Belke v. Merrill Lynch, Pierce, Fenner & Smith*, 693 F.2d 1023 (11th Cir. 1982), *overruled on other grounds*, *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, (1985), the Eleventh Circuit held that the arbitration agreement covered disputes related to acts that had occurred before the execution of the arbitration agreement.  The arbitration clause in *Belke* covered not only disputes "arising out of" the agreement, but also, in the disjunctive, "*any controversy* between [the parties] arising out of *[their] business*." 693 F.2d at 1025, n. 4 (emphasis added).  The court held that "[a]n arbitration clause covering disputes arising out of the contract *or* business between the parties evinces a clear intent to cover more than just those matters set forth in the contract." 693 F.2d at 1028 (emphasis original); *see also Seaboard Coast Line R.R. v. Trailer Train Co.*, 690 F.2d 1343, 1348 (11th Cir. 1982).  In fact, each case compelling the application of arbitration agreements to disputes related to events that had occurred before the agreement was signed contained language substantially similar to that at issue in *Belke*–very inclusive language which clearly indicates the coverage of disputes beyond the contract at issue and often includes the words "prior to" or "subsequent."  *See Kenworth*, 745 So.2d at 275.[1]

---

[1]Additionally, the Tenth Circuit has also recognized the right to compel arbitration of disputes relating to prior transactions. *See Zink v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 13 F.3d 330, 331–33 (10th Cir. 1993) (enforcing an arbitration agreement as to a dispute arising out of a transaction that predated the execution of the arbitration clause, because the clause provided for the arbitration of "*any controversy* . . . arising out of *your business or* this agreement").

17

More recently, the Eleventh Circuit declined to compel arbitration for controversies arising during time periods in which no effective arbitration agreement governed the parties.  Even though the parties subsequently entered into various contracts containing arbitration clauses, some of which used broader language than the one in the present case, the court held: "[b]ecause arbitration is strictly a matter of contract, we cannot compel arbitration for disputes which arose during time periods in which no effective contract requiring arbitration was governing the parties."  *Klay v. All Defendants*, 389 F.3d 1191, 1203 (11th Cir. 2004) (citing *Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso, P.A. v. MedPartners, Inc.*, 312 F.3d 1349, 1358 (11th Cir. 2002) ("[W]e will compel no arbitration of issues that are outside an agreement to arbitrate.").  Thus, in light of this case law in our Circuit, and the more narrowly worded language found in the agreement at issue here, Defendant must meet a strict test in order to compel arbitration in this case.  For the reasons explained below, the court cannot find that the language of the present Arbitration Agreement should be construed to cover Plaintiff's FCRA claim in this case.

It is undisputed that the acts Plaintiff complains of transpired before Douglas New signed the WSA containing the Arbitration Agreement.  (Doc. # 23 Ex. 1; Doc. # 28 Ex. 4 at 1).  Therefore, if Plaintiff's claim is to be covered by the Arbitration Agreement, that agreement must encompass all prior transactions between the parties, or, at minimum, the acts alleged in Plaintiff's complaint.  This court has already ruled that Plaintiff is not a proper party to the WSA, but even assuming *arguendo*, that she is, the language of the Arbitration Agreement cannot be stretched to cover the acts giving rise to her present claim.  By its own terms, the Arbitration Agreement covers "any and all disputes and claims (including but not limited to claims based on or arising from an alleged tort) arising out of or relating to *this Agreement, or to any prior Agreement for products or service*."  (Doc. # 43 Ex.

18

1 at 8) (emphasis added). Were Plaintiff a party to the WSA (the "Agreement"), and if she did not receive notice of an "adverse action" as defined by the FCRA *after* she became a party, the outcome here may be different. However, unlike in *Merrill Lynch*, the present arbitration clause does not reference "all controversies," but only "Agreement" and "prior Agreement." Nor does it contain language indicating the arbitration provision applies to agreements "whether entered into prior [to], on, or subsequent to the date hereof," but only "any prior Agreement." Similarly, the present clause does not contain the disjunctive language including any "business" between the parties as in *Belke*, but again only references "Agreement" and "prior Agreement for products or service." By the terms of the WSA, "Agreement" refers to the actual WSA signed by the consumer. Logically, therefore, "prior Agreement" would refer to a previous WSA or other agreement for products or service between the consumer and Cingular. "[P]rior Agreement" cannot be stretched to include a credit check that could have possibly led to a WSA. Moreover, in Plaintiff's case, the credit application did not lead to her signing a WSA at all. Thus, since the particular acts complained of cannot properly be deemed to fall within the term "a prior Agreement," and since they occurred before the "Agreement" was signed, Plaintiff's claims are not governed by the Arbitration Agreement.

### C.     Cingular Waived Its Right to Compel Arbitration.

Although the court has found that Plaintiff is not bound by the Arbitration Agreement and that, in any event, Plaintiff's claim is not covered by that agreement, for purposes of addressing Plaintiff's waiver argument, the court will assume *arguendo* that Plaintiff's claim is arbitrable. Notwithstanding that assumption, the court finds that Defendant has waived its right to compel arbitration. As the Eleventh Circuit has observed, "waiver [of the right to compel arbitration] has long been recognized in the federal scheme." *Miller v. Drexel Burnham Lambert, Inc.*, 791 F.2d 850

19

(11th Cir. 1986) (citing *La Nacional Platanera, S.C.L. v. North American Fruit & Steamship Corp.*, 84 F.2d 881 (5th Cir. 1936); *E.C. Ernst, Inc. v. Manhattan Construction Co.*, 551 F.2d 1026, 1040 (5th Cir. 1977)), *abrogation on other grounds recognized by Feldspar Trucking Co., Inc. v. Greater Atlanta Shippers Association, Inc.*, 849 F.2d 1389 (11th Cir. 1988).  Our circuit court has traditionally upheld district courts' findings of waiver if the proponent of arbitration has participated in pre-trial discovery or otherwise engaged in litigation.  See *Stone v. Hutton*, 898 F.2d 1542 (11th Cir. 1990); *S & H Contractors, Inc. v. A.J. Taft Coal Co.*, 906 F.2d 1507, 1514 (11th Cir. 1990) (holding that the party demanding arbitration had waived its right to arbitrate by filing, eight months earlier, a complaint against the other party to the arbitration agreement); *E.C. Ernst, Inc. v. Manhattan Constr. Co.*, 551 F.2d 1026, 1040-41 (5th Cir. 1977) (finding waiver and noting that, for two and a half years, the parties to the arbitration agreement had litigated their dispute before one party requested arbitration); *Burton-Dixie Corp. v. Timothy McCarthy Const. Co.*, 436 F.2d 405, 407, 408–409 (5th Cir. 1971) (finding waiver and noting that the party seeking arbitration did not attempt to invoke the arbitration provision and instead "proceeded to litigate the dispute").  Further, the Eleventh Circuit has categorically announced that "[a]rbitration should not be compelled when the party who seeks to compel arbitration has waived that right."[2]  *Morewitz v. West of England Ship Owners Mut. Protection and Indem. Association (Luxembourg)* 62 F.3d 1356, 1365 (11th Cir. 1995).

A finding of waiver is governed by a two-part test.  In *Morewitz*, the court stated that "[w]aiver occurs when a party seeking arbitration substantially participates in litigation to a point

---

[2]Although the Federal Arbitration Act uses the term "default," 9 U.S.C. § 3, the case law on this subject employs the term "waiver." *See generally* 3 FED.PROC., L.ED. *Arbitration* § 4:24 (1981) ("the term 'default' has been construed as analogous in meaning to the common-law term 'waiver'").

inconsistent with an intent to arbitrate and this participation results in prejudice to the opposing party." *Id.* at 1366.   Furthermore, the *Morewitz* court noted that "[p]rejudice has been found in situations where the party seeking arbitration allows the opposing party to undergo the types of litigation expenses that arbitration was designed to alleviate." *Id.*  An application of this two-part test reveals substantial participation in this litigation by Cingular, as well as prejudice to Plaintiff, such that Cingular has waived its right to compel arbitration.

In the present case, Cingular's own records show that it was aware of facts relating to Plaintiff's use of her son's cellular telephone, of her payment of the bills for that telephone, and of her calls to Cingular support services before she filed this lawsuit.  (Doc. # 40 Ex. 1).  In fact, Cingular, cites to that evidence to support its argument that Plaintiff is bound by the Arbitration Agreement.  (Doc. # 37; Doc. # 41).  However, when confronted with the issue of waiver, Defendant Cingular quickly attempts to disclaim any knowledge of Plaintiff's use of the cellular account until her affidavit dated February 21, 2006.  (Doc. # 41 Ex. 1 at ¶¶ 2-3).  As such, this court concludes that a delay of eight months in moving to compel arbitration, coupled with Defendant's extensive participation in discovery–both voluntary and court mediated (the latter being even more antithetical to the policy underlying arbitration)–hearings, and the litigation process generally (Doc. # 40 Ex. 2), is more than enough evidence to support the court's finding that Defendant has waived its right to compel arbitration.  Plaintiff has already invested substantial time and financial resources in this litigation, and would not have done so had Cingular raised a valid arbitration issue earlier in this case.  This has undoubtedly prejudiced Plaintiff. *See S & H Contractors, Inc. v. A.J. Taft Coal Co.*, 906 F.2d 1507, 1514 (11th Cir. 1990) ("When determining whether the other party has been prejudiced, we may consider the length of delay in demanding arbitration and the expense incurred

by that party from participating in the litigation process."); *see also Frye v. Paine, Webber, Jackson & Curtis, Inc.*, 877 F.2d 396, 399 (5th Cir. 1989), *cert. denied*, 494 U.S. 1016 (1990). Furthermore, Defendant, in failing to compel arbitration at an earlier time, has occupied this court's time and energies to the point of undermining one of the goals of the FAA–judicial economy and efficiency. *See e.g.*, *Ivax Corp. v. B. Braun of Am. Inc.*, 286 F.3d 1309, 1315-16 (11th Cir. 2002) (quoting *S & H Contractors, Inc. v. A.J. Taft Coal Co.*, 906 F.2d 1507, 1514 (11th Cir. 1990)) (counseling that courts, when considering the question of waiver, should look to the "totality of the circumstances" to determine if the movant has "acted inconsistently" with the right to compel arbitration and if this has "in some way prejudiced" the other party).

In answer to these well settled legal principles, Defendant insists that it cannot be held responsible for information "filed away somewhere within its corporate storehouse." (Doc. #41 at 9). To bolster this proposition and argue that the appropriate time period in which to compel arbitration was extended, Defendant cites to the Eleventh Circuit case, *Middlesex Mutual Ins. Co. v. Levine*, 675 F.2d 1197 (11th Cir. 1982). However, that case concerns an assertion of partiality on the part of an arbitrator (which was made after an arbitration proceeding and award) and where there was *active fraud* on the part of the arbitrator claiming impartiality. Above all else, the court in *Middlesex Mutual* was concerned with the impartiality of the arbitrator as a guarantor of fairness in the arbitration process *once the process had been properly invoked*. *Id*. at 1201. This reflects a very different set of policy considerations than those invoked by Defendant, which argues the "'interest[s] of processing expeditiously a great volume of business'" should excuse its initial oversight that Plaintiff's claim was not arbitrable. (Doc. # 41 at 10 (citing *Middlesex Mutual Ins. Co.,* 675 F.2d

22

at 1202)).[3]  Economic efficiency–here Defendant's excuse for not invoking arbitration earlier in the litigation process–is the *chief* policy behind the federal preference for arbitration.  Thus, courts are not predisposed to allow a litigant to invoke rights that it has knowingly or recklessly (or, perhaps, even negligently) waived by using a "business efficacy" excuse, if the result is to prejudice its opponent and undermine the judicial economy and economic conservation policies underlying the FAA itself.  *See Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 217 (1985); *see also Frank v. American General Finance, Inc.*, 23 F.Supp.2d 1346 (S.D. Ala. 1998) (citing 9 U.S.C. § 3; *Morewitz v. West of England Ship Owners Mutual Protection and Indemnity Association*, 62 F.3d 1356, 1365 (11th Cir. 1995), *cert. denied*, 516 U.S. 1114 (1996)) (holding that "the right to arbitrate is a waivable right which the defendant may waive intentionally or even negligently by failing to assert it timely").  Despite Defendant's appeals to its sense of economic efficiency, the court still finds that Defendant has waived its right to compel arbitration by substantially participating in this  litigation before so moving and thereby prejudicing Plaintiff.

## III.   Conclusion

In summary, the court finds Cingular's Motion to Compel Arbitration and to Stay Litigation Pursuant to the Federal Arbitration Act (Doc. # 24) is due to be denied.  The court concludes that WSA and its Arbitration Agreement are not applicable to Plaintiff, a nonsignatory, under any of

---

[3]In fact, the *Middlesex* court remarked: "The general proposition that an insurance company's claims division ordinarily is not chargeable as a matter of law with the contents of its underwriting files *only incidentally impacts upon our decision*. Three salient facts also are present in this case: (1) The arbitrator was selected because he withheld information which *he had the affirmative duty to disclose*; (2) the information creating the appearance of partiality arose from dealings between the arbitrator and appellants outside the ordinary course of business; and (3) Congress placed arbitrators under the heavy obligation to act out of *strict morality and fairness*."  *Middlesex Mutual Ins. Co. v. Levine*, 675 F.2d 1197, 1203 (11th Cir. 1982) (emphasis added).

Defendant's three theories, as Plaintiff's son was not acting as her agent when he signed the WSA, Plaintiff was not a third-party beneficiary under the WSA, and Plaintiff is not equitably estopped from avoiding the Arbitration Agreement.  Further, the court finds that even if the WSA bound Plaintiff, her claim falls outside the scope of the Arbitration Agreement, since it does not "aris[e] out of or relat[e] to" the WSA or "any prior Agreement for products or service."  Finally, the court concludes, in any event, that Defendant waived its right to compel arbitration, since it substantially participated in litigation, and that participation prejudiced Plaintiff.

An appropriate order shall be entered contemporaneously with this memorandum opinion.

**DONE** and **ORDERED** this    21st    day of September, 2006.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

24